

EOD
12/15/2008

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

In re:                                          **Chapter 11**

**TWL CORPORATION and**                    **Case No. 08-42773-BTR-11**
**TWL KNOWLEDGE GROUP, INC.,**             **Case No. 08-42774-BTR-11**

          **Debtors.**                   **Jointly Administered Under**
_____/          **Case No. 08-42773-BTR-11**

## ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING (1) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (2) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES TO TWL ACQUISITION LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS[1]

THIS CAUSE came before the Court on December 5 and 8, 2008 in Plano, Texas upon the *Debtors' Motion for Orders (i) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, Interests to TWL Acquisition, LLC or to the Highest and Best Bidder; (ii) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases to TWL Acquisition, LLC or to the Highest and Best Bidder; (iii) Establishing Auction Date, Related Deadlines and Bid Procedures; and (iv) Approving the Form and Manner of Sale Notices* (the "Sale Motion") (D.E. #15) seeking, *inter alia*, an order authorizing the sale (the "Sale") of substantially all the assets of TWL Corp. and TWL Knowledge Group, Inc. (the "Debtors" or "Seller") to TWL Acquisition LLC (the "Buyer") free and clear of Liens, Claims and Interests[2], pursuant to 11 U.S.C. §§ 105, 363, 365 and Rules 2002(a)(2), 6004, 6006, 7062

---

[1]    The Findings of Fact and Conclusions of Law contained herein constitute the findings of fact and conclusions of law required to be entered by this Court with respect to the Sale Motion pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

[2]    Except as otherwise noted, capitalized terms used in this Order have the meanings ascribed to such terms in the Asset Purchase Agreement dated as of November 7, 2008, and as modified on the record at the Sale Hearing on

and 9014 of the Federal Rules of Bankruptcy Procedure (the assets to be sold being more fully described in the Sale Motion and collectively defined in the Asset Purchase Agreement and hereinafter referred to as the "Purchased Assets"); and (b) the Court's Order dated October 30, 2008, (the "Bidding Procedures Order") (D.E. #31), authorizing the Debtors to proceed with the sale procedures set forth therein and in the Asset Purchase Agreement and Buyer Cash Protections and competitive bidding procedures contained in the Asset Purchase Agreement (together with the Buyer Cash Protections, the "Bidding Procedures") and approving the form of notice of the Hearing on the Sale Motion, and scheduling the December 5, 2008 hearing (the "Sale Hearing") on the Sale Motion; and

All parties in interest having been heard, or having had the opportunity to be heard, regarding approval of the Asset Purchase Agreement, and the transactions contemplated thereby (the "Transactions"), and the Court having considered all evidence presented, including, without limitation, the proffers of, and the testimony of Daniel Nenadovic, as a Partner and Managing Director of The Comvest Group ("Nenadovic") and Normal Willox ("Willox"), the Proposed CEO of the Buyer, and Patrick Quinn, the CEO and CFO of the Debtors, and having received evidence through the affidavits of Nenandovic and Willox and the Exhibit Registers of the Debtors and Buyer, and due deliberation being had, and this Court having considered all timely objections and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

---

December 5, 2008 (the "Asset Purchase Agreement").  As used herein, "Liens, Claims and Interests" shall have the meaning set forth in paragraph C of the decretal portion of this Order.

1849985-2
439341

## I.    FINDINGS OF FACT[3]:

### A.    Basis For Section 363 Sale

1.    Time is of the essence in consummating the Sale.  Accordingly, to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Asset Purchase Agreement.  The Sellers' DIP financing with the Secured Lender in this case expired on December 6, 2008.  The Secured Lender will not provide any further financing to the Sellers after this date and the Sellers have no ability to obtain any further alternative financing that would allow Sellers to continue as a going concern.

2.    The Purchased Assets are property of the Debtors' estates and title thereto is vested in the estates.

3.    The Debtors have marketed the Purchased Assets since September, 2008, but have been unable to consummate any transactions outside the auspices of bankruptcy court protection.  The Debtors provided notice of the Sale to the Buyer and to each of the entities which expressed a bona fide interest in the Purchased Assets or the Business in the last ninety (90) days.  Debtors directly solicited more than eleven (11) prospective purchasers, both prior to and after the Petition Date.  All of these prospective purchasers signed a confidentiality agreement and conducted some due diligence.  At least five (5) of the prospective purchasers conducted substantial due diligence.  The Debtors and their professionals provided information to and worked with all of the prospective buyers who signed confidentiality agreements regarding the Purchased Assets after the entry of the Bidding Procedures Order.

---

[3]    Additional Findings of Fact and Conclusions of Law made by the Court on the record at the Sale Hearing are expressly incorporated by reference into this Order and made a part hereof.

**B.** **Notice of Sale of The Assets**

4.      Written notice (the "Notice") of the Sale Hearing, pursuant to the Certificate of Service of Notice of the Hearing and Sale filed by the Debtors on October 27, 2008 with this Court and approved by the Court in the Bidding Procedures Order, was transmitted to:  (a) the Office of the United States Trustee; and (b) to all (i) creditors as defined in Section 101(1) of the Bankruptcy Code; (ii) shareholders; (iii) entities known to the Debtors to possess and/or exercise any control over any of the Purchased Assets; (iv) entities known to the Debtors to assert any rights in any of the Purchased Assets; (v) parties in interest and other entities and persons so entitled which are known to the Debtors; (vi) non-debtor parties to Assumed Agreements; (vii) all other entities which Debtors believe may have a claim against any of the Debtors; (viii) all applicable federal, state and local tax authorities with jurisdiction over the Debtors and/or the Purchased Assets; (ix) all federal, state and local environmental authorities in jurisdictions in which the Debtors operate and/or in which the Purchased Assets are located; (x) any known party which has expressed a bona fide interest in writing to the Debtors regarding any purchase of the Purchased Assets in the last two years; and (xi) all entities which have requested notice in the Debtors' Chapter 11 cases.

5.      The Notice was adequate and sufficient under the circumstances of these Chapter 11 cases and this proceeding and complied with the various applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the procedural and substantive due process requirements of the Federal Rules of Civil Procedure and United States Constitution.

1849985-2
439341

### C. Good Faith Of The Buyer

6. The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of 11 U.S.C. § 363(m), and is therefore entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, among other things: (a) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring all or any portion of the Purchased Assets; (b) the Buyer agreed to provisions in the Asset Purchase Agreement approved in the Bidding Procedures Order which would enable the Debtors to accept a higher and better offer for the Purchased Assets at the Auction; (c) the Buyer in no way induced or caused the Chapter 11 filing of the Debtors; (d) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Transactions have been disclosed; (e) the Buyer has not violated 11 U.S.C. §363(n) by any action or inaction; and (f) the negotiation and execution of the Asset Purchase Agreement and any other agreements or instruments related thereto was in good faith and an arms-length transaction between the Buyer and the Debtors.

### D. Competing Offers

7. One (1) competing offer was submitted pursuant to the Bidding Procedures Order from International Human Resources Development Corporation ("IHRDC"). IHRDC withdrew its offer before it was designated by the Debtors as a Qualified Competing Bid. The IHRDC offer was for $3.1 million in cash. The consideration to be paid by Buyer substantially exceeds the IHRDC offer.

1849985-2
439341

8.      The Debtors have received no other qualified competing bids to purchase the Purchased Assets.

9.      The Debtors and the Buyer have substantially complied with all requirements set forth in the Bidding Procedures Order.

**E.      Approval Of Motion**

10.      The Buyer is a third-party, good-faith purchaser unrelated to the Debtors.

11.      The purchase terms, as set forth in the Asset Purchase Agreement and as modified in this Order, are the product of arms-length negotiations between the Debtors and the Buyer and are fair and reasonable under the circumstances of these Chapter 11 cases and this proceeding.   Pursuant to Section 3.2 of the Asset Purchase Agreement, the portion of the Purchase Price described in Section 3.1(b) is increased from $1,100,000.00 in cash to $1,725,745.50.

12.      The Sale Motion should be approved as it is in the best interests of the Debtors, their estates, and their creditors.

13.      The Asset Purchase Agreement represents a fair and reasonable offer under the circumstances of these Chapter 11 cases.

**F.      The Buyer is Not a Mere Continuation of the Debtors**

14.      The following findings of fact relate to the conclusions of law set forth in Section II(D) below:

a.      Those of the Debtors' employees who are to be retained by the Buyer are being hired under new employment contracts or other

6

arrangements to be entered into or to become effective only at or after the time of the Closing.

b.      No common identity of incorporators, directors or stockholders exists between the Buyer and the Debtors.

c.      The Buyer is not purchasing all of the Debtors' assets.  The Buyer is not purchasing Excluded Assets as more particularly set forth in the Asset Purchase Agreement.

d.      The Transactions are not being entered into fraudulently. The Sale has been properly noticed and the estates' creditors, non-debtor parties to the Assumed Agreements and other parties-in-interest have been provided with sufficient opportunity to object to the Sale.

e.      The Buyer is not holding itself out to the public as a continuation of the Debtors.

**G.    Buyer's Adequate Assurance of Future Performance**

15.      The Buyer has presented evidence to the Court of financial capability to fund the Asset Purchase Agreement and, on this basis, the Court finds that the Buyer has the financial wherewithal to meet all of its future financial obligations pursuant to the terms of the Assumed Agreements.   The Buyer also provided unrebutted evidence of the hiring and appointment of Willox and an operating team to demonstrate sufficient experience in the industry, and on this basis the Court finds that the Buyer has the ability to operate the business of the Buyer in the future.

1849985-2
439341

### H.    Miscellaneous

16.    To the extent any findings of facts set forth in Section I, paragraphs 1-16 and all sub-parts thereto, herein constitute conclusions of law, the Court so concludes.

## II.    CONCLUSIONS OF LAW

The Court hereby enters the following Conclusions of Law:

### A.    Jurisdiction, Final Order And Statutory Predicates

17.    The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

18.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and this Order shall constitute entry of judgment as set forth herein.

19.    This Order shall be effective immediately upon entry and any stay of this Order as otherwise provided by Rules 6004(h), 6006(d), and 7062 is expressly lifted regardless of the objections to the Sale or whether the parties thereto agreed to waive such objections at the Sale Hearing.

20.    This proceeding is a "core proceeding" within the meaning of 28 U.S.C. §157(b)(2)(A), (N) and (O).

1849985-2
439341

21.     The statutory predicates for the Sale Motion are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 7062, 9014 and 9019.

22.     The proposed Sale constitutes a sale of property of the Debtors' estates outside the ordinary course of business within the meaning of Section 363(b) of the Bankruptcy Code.

**B.     Section 363 Sale**

23.     The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.  The Purchased Assets include all Intellectual Property Rights as defined in the Asset Purchase Agreement, including, without limitation, all trade names owned by the Debtors identified in the Asset Purchase Agreement.

24.     The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Transactions, if the Sale to the Buyer and the assignment of the Assumed Agreements to the Buyer were not free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, except for those specifically assumed by the Buyer in the Asset Purchase Agreement or if the Buyer would, or in the future could, be liable for any of the Liens, including, without limitation, tax liability claims, environmental liability claims, product liability claims, product warranty claims, competing claims relating to any of the intellectual property, and any employee related claims including, without limitation, under WARN, the Employment Retirement Income Security Act, Comprehensive Omnibus Budget Reconciliation Act and/or employee severance claims.

25.     The provisions of Section 363(f) of the Bankruptcy Code have been satisfied.

9

1849985-2
439341

26.    Valens has consented to the Sale of the Purchased Assets on which it has liens.  Those (i) holders of Liens and (ii) non-debtor parties to Assumed Agreements which did not object, or which withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to 363(f)(2) of the Bankruptcy Code.  Those (i) holders of Liens and (ii) non-debtor parties to Assumed Agreements which did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim a Lien.  Trinity Investments, G.P. ("TIGP") asserts a second priority lien on all of the Debtors' assets.  The Debtors have scheduled the alleged secured claim of TIGP as disputed.  The Official Committee of Unsecured Creditors ("Committee") has filed an objection to the secured status of TIGP's claim.  TIGP did not object to the Sale Motion nor has it responded to the objection to its secured status.  The liens and claims of TIGP are therefore, at best, subject to a bona fide dispute and accordingly the Purchased Assets can be sold free and clear of any Liens, Claims or Interests of TIGP.

27.    Technomedia International, Inc. and TWL Skill Ventures LLC n/k/a Skill Ventures International LLC (collectively, "Skill Ventures") asserts that it is the holder of an interest in certain courseware content owned by the Debtors pursuant to a Courseware/Software Distribution Agreement by and between Trinity Workplace Learning, Inc. (a predecessor in interest to the Debtor, TWL Knowledge Group, Inc.) and Skill Ventures dated as of May 14, 2007 (the "Distribution Agreement").  The Debtors assert, and provided evidence at the Sale Hearing, that the Distribution Agreement had been terminated prior to the Petition Date, based on various defaults under the Distribution Agreement and certain related agreements.  At the

Sale Hearing, Skill Ventures asserted that the Distribution Agreement had not been terminated and remains in force and effect.  At best, any claim or interest of Skill Ventures arising under the Distribution Agreement is the subject of a "bona fide dispute" as such term is used in 11 U.S.C. § 363(f)(4). Accordingly, the Purchased Assets (including, without limitation, the Debtors' Content Library) are being transferred to Buyer free and clear of all Liens, Claims and Interests arising under, related to, or in connection with: (i) that certain Joint Venture Agreement by and between Technomedia International, Inc. and Trinity Workplace Learning Corporation (a predecessor in interest to the Debtors) dated as of November 1, 2006 (the "Skill Ventures Agreement"), (ii) the TWL Skill Ventures LLC, as described in the Skill Ventures Agreement, (iii) the Distribution Agreement, and (iv) any other documents executed by Skill Ventures with respect to any of the Purchased Assets. Based on the record established at the Sale Hearing, the Court finds that all of the "Software" and courseware content as defined and identified in the Distribution Agreement is part of and presently included in the Debtors' Content Library and forms a part of the Purchased Assets under the Asset Purchase Agreement with the Buyer, and Skill Ventures' interest, if any, in and to the Debtors' "Content Library" under the Distribution Agreement is subject to, and in, a "bona fide dispute" within the meaning of Section 363(f)(4). The Sale of the Debtors' Content Library to the Buyer shall be, and hereby is, clear of Skill Ventures' disputed interest under the Distribution Agreement. Accordingly, Skill Ventures shall have no further interest in the Purchased Assets, including the Debtors' Content Library. Skill Ventures' separate request at the Sale Hearing for adequate protection within the meaning of Section 363(e) is also denied.  While the holder of a disputed interest may be entitled to adequate protection under certain circumstances, the Court finds that

11

Skill Ventures failed to sustain its burden of proof as required by Section 363(p)(2) as to the existence, validity priority, and extent of the interest entitled to such protection, and, accordingly, no adequate protection by the Debtors or the Buyer shall be required in order for the Sale to proceed free and clear of the Distribution Agreement. Lastly, the Court finds and concludes that Section 365(n) of the Code has no applicability in the matter before the Court at this time.   Skill Ventures has not sustained its burden of showing that there is a valid, enforceable Distribution Agreement that is an executory contract subject to assumption or rejection under Section 365, nor are the Debtors seeking to reject the Distribution Agreement at this time.   Accordingly, Skill Ventures is not entitled to any rights or protections under 11 U.S.C. Section 365(n) with respect to the Skill Ventures Agreement, the Distribution Agreement or any other documents executed by Skill Ventures with respect to any of the Purchased Assets.

        28.     Given all of the circumstances of these Chapter 11 cases and the adequacy and fair value of the purchase price under the Asset Purchase Agreement, the proposed Sale of the Purchased Assets to the Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

### C.    Retention Of Jurisdiction

        29.     As hereinafter provided, it is necessary and appropriate for the Court to retain jurisdiction to, inter alia, facilitate the Transactions contemplated by the Asset Purchase Agreement, interpret and enforce the terms and provisions of this Order and the Asset Purchase Agreement and to adjudicate, if necessary, any and all disputes concerning the assumption and assignment of the Assumed Agreements, any right, title, (alleged) property interest, including

ownership claims, relating to the Purchased Assets and the proceeds thereof, as well as the extent, validity and priority of all Liens, Claims and Interests relating to the Purchased Assets and any future disputes with Skill Ventures.

**D.    No Successor Liability**

30.    The Buyer does not constitute a successor to the Debtors or the Debtors' estates.

a.    The Transactions do not amount to a consolidation, merger or <u>de facto</u> merger of the Buyer and the Debtors or the Debtors' estates.

b.    The Buyer is not merely a continuation of the Debtors or the Debtors' estates, there is not substantial continuity between the Buyer and the Debtors.

**E.    Miscellaneous**

31.    To the extent any conclusion of law set forth in Section II, paragraphs 18-30 herein constitutes a finding of fact, this Court so finds.

**Based on the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:**

A.    The relief requested in the Sale Motion is granted as set forth herein.  The Asset Purchase Agreement, the Transactions, and the Sale of the Purchased Assets are hereby approved in all respects.

B.    The Debtors are authorized and directed to take any and all actions necessary or appropriate to (i) consummate the Sale of the Purchased Assets to the Buyer (including, without

13

limitation, to convey to the Buyer any and all of the Purchased Assets intended to be conveyed) and the Closing of the Transactions in accordance with the Sale Motion, the Asset Purchase Agreement and this Order; and (ii) perform, consummate, implement and close fully the Asset Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement.

C.      Upon the Closing and satisfaction of all Indebtedness to Valens as provided in paragraph I below, the Debtors are authorized and directed to effectuate the sale, transfer and assignment of the Purchased Assets to Buyer free and clear of any and all liens, security interests, encumbrances, pledges, claims, charges, mortgages, other restrictions, and other interests within the meaning of 11 U.S.C. § 363(f) of every kind, nature and description, whether disputed, fixed or contingent, perfected or unperfected (collectively, the "Liens, Claims and Interests"), excluding only the identified Assumed Liabilities as defined in the Asset Purchase Agreement, with all of the Liens, Claims and Interests, excluding the Assumed Liabilities, released, terminated and discharged as to the Purchased Assets and attaching to the proceeds of the Sale with the same rights and priorities therein as in the Purchased Assets.

D.      The Buyer is not assuming, and shall not be bound by or liable for, any claims, objections, suits against or liabilities of the Debtors (or any entity which may be liable with the Debtors) of any kind or nature, whether choate, inchoate, absolute, accrued, contingent, whether arising pre-petition or post-petition, or otherwise and whether due or to become due and whether or not asserted, and whether known or unknown, except for the Assumed Liabilities as set forth in the Asset Purchase Agreement.

E.      In accordance with the powers available to this Court under 11 U.S.C. § 105, all claimants, creditors, employees and shareholders of the Debtors shall, upon Closing of the Sale be permanently and forever barred, restrained, precluded and enjoined from asserting any claims, commencing or continuing in any manner any action or other proceeding of any kind against the Buyer with respect to the Purchased Assets sold to the Buyer under the Asset Purchase Agreement and the transactions contemplated therein, including, without limitation, any existing future claims to the Content Library by Skill Ventures, any theory of successor liability, de facto merger, or substantial continuity, whether based in law or equity, employee benefit obligations (including, without limitation, under WARN, the Employee Retirement Income Security Act, the Comprehensive Omnibus Budget Reconciliation Act and/or employee severance claims), CERCLA and all other Environmental Laws, any security interest, mortgage, lien, charge against or interest in property, adverse claim, claim of possession, right of way, license, easement or restriction of any kind, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership or any option to purchase, option, charge, retention agreement which is intended as security or other matters of any person or entity that encumber or relate to or purport to encumber or relate to the Purchased Assets, except for and to the extent of the Assumed Liabilities and specific obligations to be assumed or taken subject to by the Buyer thereunder or as set forth in the Asset Purchase Agreement.

F.      Each and every term and provision of the Asset Purchase Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon, the Debtors, the Debtors' estates, its claimants, creditors, employees and the Debtors' shareholders, Skill Ventures, all entities and third parties, administrative agencies, governmental departments,

secretaries of state, federal, state and local officials, maintaining any authority relating to ERISA, COBRA, WARN Environmental Laws and/or Tax Laws, and their respective successors or assigns, including, but not limited to all non-debtor parties to the Assumed Agreements which may be assigned to the Buyer under the Asset Purchase Agreement and persons asserting any Lien against or interest in the estates or any of the Purchased Assets to be sold and assigned to the Buyer, irrespective of any action commenced which contests the Debtors' authority to sell and assign the Purchased Assets or which seeks to enjoin such sale and/or assignment.

G.      In accordance with the powers available to this Court under 11 U.S.C. § 105, all taxing authorities whether federal, state or local are hereby permanently and forever barred, restrained and enjoined from asserting any claims, commencing or continuing in any manner any action or other proceeding of any kind against the Buyer or the Purchased Assets sold to the Buyer under the Asset Purchase Agreement, except for and to the extent of the specific Tax obligations to be assumed or taken subject to by the Buyer as set forth in the Asset Purchase Agreement, including, without limitation, any theory of successor liability, de facto merger, or substantial continuity, whether based in law or equity, for any and all Taxes relating to the Purchased Assets or the Business which, under the Bankruptcy Code, would be deemed to be Taxes that arose prior to the Closing Date, and all income Taxes of the Debtors of any kind or nature, regardless of when arising including, without limitation, sales and local tax claims, ad valorem tax claims (real property, tangible personal property and intangible personal property), occupational license tax claims, and state and local income tax claims.

H.      The amount of $244,000 from the proceeds of the sale of any of the Debtors' assets located in the state of Texas shall be set aside by the Debtors in the Debtors' law firm's

trust account as adequate protection for the alleged secured claims of Dallas County, Harris County, Montgomery County, Orange County, Tarrant County, Irving Independent School District, Lewisville Independent School District, Carrollton-Farmers Branch Independent School District and Denton County (the "Texas Tax Authorities") prior to the distribution of any proceeds to any other creditor. The liens of the Texas Tax Authorities shall attach to these proceeds to the same extent and with the same priority as the liens they now hold against the property of the Debtors based on the alleged secured claims asserted by The Texas Tax Authorities. These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Texas Tax Authorities, nor a cap on the amounts they may be entitled to receive. Furthermore, the alleged claims and corresponding liens of the Texas Tax Authorities shall remain subject to any objections any party would otherwise be entitled to raise as to the Texas Tax Authorities alleged claims and the priority, validity or extent of such liens. These funds may not be distributed apart from agreement between the Texas Tax Authorities, the Debtors and the Unsecured Creditors' Committee, or by subsequent order of the Court, duly noticed to the Texas Tax Authorities.

I.      Any and all obligations of the Debtors under the Valens' secured claims, and DIP Loan with Valens, shall be satisfied and fully paid directly to Valens at the Closing in accordance with the payoff letter dated December 11, 2008, executed by the Debtors, Valens and the Committee and upon such payment at Closing no amount shall be due to Valens from the proceeds of the Sale except as contemplated by the payoff letter.  As provided in the payoff letter, Valens and the Committee have reached a settlement whereby $40,000 of the Valens

17

payoff shall be retained by the Debtors' bankruptcy estates for disposition pursuant to the priorities of the U.S. Bankruptcy Code, in exchange for a release from the Committee.

J.      This Order: (i) is and shall be effective as a determination that, upon Closing, all Liens, Claims and Interests existing as to the Purchased Assets conveyed to the Buyer have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated, and (ii) shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, accreditation associations or agencies, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets conveyed to the Buyer.  Upon payment of the Purchase Price, any and all Liens, Claims and Interests on the Purchased Assets shall attach to the proceeds of the Purchased Assets in the same order of priority as they existed prior to the Closing and shall no longer attach to the Purchased Assets.  Except for Valens, whose Liens shall be satisfied in full and released as of the Closing, all such entities described above in this paragraph I are authorized and specifically directed to strike all such recorded Liens against the Purchased Assets from their records, official and otherwise and including without limitation those Liens listed in the applicable schedules to the Asset Purchase Agreement.

K.      The Debtors are hereby authorized, effective only as of the Closing and in accordance with §§365(b)(1) and (f)(2) of the Bankruptcy Code, to: (A) assume the Assumed

18

Agreements; (B) sell, assign and transfer to the Buyer, each of the Assumed Agreements in each case free and clear of all Liens, Claims and Interests; and, (C) execute and deliver to the Buyer, such assignment documents as may be necessary to sell, assign and transfer the Assumed Agreements.  The Debtors have (i) cured, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Agreements, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Agreements, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and the Buyer has provided adequate assurance of its future performance of and under the Assumed Agreements, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.  Unless paid from the proceeds of the Sale, except as set forth in this sentence, the Cure Payments shall be allowed and paid by the Debtors as an administrative claim pursuant to Section 503(b)(1)(A) of the Bankruptcy Code with priority over any and all other administrative expenses in the Chapter 11 cases of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code or if the Chapter 11 cases are converted to Chapter 7 cases, provided however, that the Cure Payments shall be junior and subordinate to payment of any and all claims of Valens under the DIP Loan, including, but not limited to, claims arising from obligations of the Debtors that survive the termination thereof. Except as to those payments to be made directly at Closing, the Buyer shall have no responsibility whatsoever therefor, whether to any third party or otherwise with respect to the Cure Payments.

L.      With respect to the Assumed Agreements: (i) the Assumed Agreements shall be transferred and assigned to, and following the Closing of the sale remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Agreement (including those of the type described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Agreements after such assignment to and assumption by the Buyer; (ii) each Assumed Agreement is an executory contract of the Debtors under Section 365 of the Bankruptcy Code; (iii) the Debtors may assume at Closing each Assumed Agreement in accordance with Section 365 of the Bankruptcy Code; (iv) the Debtors may assign at Closing each Assumed Agreement in accordance with Sections 363 and 365 of the Bankruptcy Code and any provisions in any Assumed Agreement that prohibit or condition the assignment of such Assumed Agreement or allow the party to such Assumed Agreement to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Agreement, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (v) all other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Agreement have been satisfied; and (vi) upon Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Agreement.  In addition to the foregoing, the Debtors shall assign and the Buyer may assume all confidentiality agreements the Debtors or their representatives may have entered

20

into with any interested parties related to the sale of all or any portion of the Purchased Assets. Thereafter, the Buyer may enforce such confidentiality agreements pursuant to the applicable provisions of this Order.

M.      The Debtors are assuming and assigning to the Buyer that certain Galaxy II Transponder Lease Agreement dated as of May 16, 2007, as amended, and TWL Knowledge Group, Inc., the Buyer and Intelsat Corporation ("Intelsat") are entering into an Assignment and Assumption Agreement which provides for, *inter alia*, (i) a payment by the Debtors to Intelsat from the sale proceeds of $192,000, (ii) the Debtors' consent to Intelsat setting off its pre-petition deposit in the amount of $130,000 against the Debtors' pre-petition obligations of approximately $221,000, (iii) the waiver of all other pre-petition and post-petition claims against the Debtors, (iv) the Buyer and Intelsat entering into a three (3) year lease for transponder capacity at the rate of $82,800 per month, and (v) the Buyer posting no cash deposit to Intelsat.  Subject to these agreements, the Objection of Intelsat to the Sale Motion is withdrawn.  Upon payment of the amounts set forth above, Intelsat shall have no other claims of any kind against the Debtors or their estates.

N.      The Debtors are assuming and assigning that certain Broadcast Services Agreement between the Debtors and VHA, Inc. ("VHA").  At Closing, VHA shall be paid a cure payment of $60,000.00.  Subject to the foregoing, the Objection of VHA to the Sale Motion is withdrawn.  Upon payment of the amount set forth above, VHA shall have no other claims of any kind against the Debtors or their estates.

O.      The Reseller Agreement between NBC Universal Inc. and NBC Digital Health Network, Inc. (collectively, "NBC") and the Debtors, and related agreements entered into by the

Debtor and third parties pursuant to the Reseller Agreement, are not being assumed and assigned. The Objection of NBC to the Sale Motion is withdrawn, subject to the Debtors and NBC entering into a separate stipulation to be so ordered by this Court, providing for rejection and termination of the NBC Reseller Agreement (the "NBC Stipulation"). The NBC Stipulation is being submitted simultaneously with this Order.

P.      The Objection of Joint Commission Resources, Inc. ("JCR") to the Sale Motion is overruled. The December 1, 2005, contract between the Debtors and JCR is not being assumed and assigned to the Buyer. The JCR contract is rejected by the Debtors.

Q.      The Agreement between Debtors and Gould, Inc. Programmable Control Division ("Gould") predecessor-in-interest to Medicon, Inc. and Tel-A-Train, Inc. dated October 19, 2003, is being assumed and assigned to the Buyer. At Closing, Gould will be paid a cure amount of $1,509.37. Upon payment of the amount set forth above, Gould shall have no other claims of any kind against the Debtors or their estates.

R.      The Production Agreement between Debtors and Flying Fish Creative Services, Inc. ("Flying Fish") is not being assumed and assigned to Buyer. The Flying Fish contract is rejected by the Debtors.

S.      The Debtors are assuming and assigning the lease between Debtors and Key Equipment Finance, Inc. ("Key Equipment"). At Closing, Key Equipment will be paid a cure payment of $406.54. Upon payment of the amount set forth above, Key Equipment shall have no other claims of any kind against the Debtors or their estates.

T.      The Debtors are not assuming the Facility Lease and the Buyer shall be permitted to use and occupy the Facility covered by the Facility Lease without interruption or interference

for a period of up to 120 days after the Closing to operate the Business while implementing a relocation of the Business, and during which time as Buyer occupies the Facility under the Facility Lease, Buyer will pay, directly to the landlord under the Facility Lease, on a monthly basis rent under the Facility Lease during the time period of Buyer's occupancy of the Facility in an amount not to exceed the sum of (i) $194,599.52 per month plus (ii) 1/12 of the estimated amount of ad valorem taxes due and payable with respect to the Facility with respect to such month.  The monthly tax obligation is estimated at $44,019.49.   Upon receipt by Landlord of the 2009 tax statements from any taxing authority authorized to assess and/or collect property taxes in connection with the Leased Premises, Landlord shall, within ten (10) business days submit the tax statements along with a statement indicating any unpaid amounts due for or, in the alternative, refunding any overpayment of, the ad valorem taxes by Buyer.  Buyer shall remit any unpaid amounts within ten (10) business days after receipt of the statement from Landlord. Buyer shall also provide to Landlord a notice address and shall have a continuing obligation to provide Landlord with any updated notice address if there is any change in its address within ten (10) business days of same.   This Court shall retain continuing jurisdiction over any claims arising in connection with payment or nonpayment of the monthly ad valorem taxes as required in this Order.   In the event Buyer vacates the Facility prior to the expiration of such month in question, then, such ad valorem taxes paid by Buyer for such month shall be prorated.   Buyer shall also be responsible for any and all tenant maintenance obligations provided for in the Facility Lease, including, but not limited to, Section 8(b).  In addition, Buyer shall deliver to the Landlord certificate(s) of insurance complying with the insurance requirements of the Facility Lease and evidencing Buyer as an insured party in connection with the Leased Premises for the

time period of Buyer's occupancy of the Facility (provided however that Buyer shall not be obligated to pay any obligation or liability under the Facility Lease accruing prior to the Closing).  Buyer reserves the right to vacate the Facility prior to the expiration of 120 days after the Closing by sending written notice to the Debtors and Landlord at least thirty (30) days prior to the proposed vacation date and, upon Buyer's vacation of the Facility, Buyer shall have no further obligation to pay rent or any other cost, expense, payment under the Facility Lease or otherwise (including, without limitation, any payment required to be paid to such landlord upon the rejection of the Facility Lease by Seller).  In such notice to vacate, Buyer will request that Seller reject the Facility Lease in these Chapter 11 Cases effective on the day of such vacation date designated by Buyer.  The Debtors shall take all commercially reasonable steps to maintain Buyer's uninterrupted use and occupancy of the Facility under the Facility Lease between the Closing Date and the date Buyer, if necessary, completes a relocation of the Business and vacates the Facility.  The Debtors shall transfer to Buyer and Buyer shall own legal and beneficial title in and to all personal property located in the Facility at the Closing, free and clear of all Liens, Claims and Encumbrances (including, without limitation, any and all Texas constitutional, statutory or contractual landlord liens and security interests) and Buyer shall be entitled to remove from, and/or sell, such personal property located in the Facility after the Closing.  The Buyer, counsel for the Buyer and counsel for the Debtors shall receive written notice of any monetary default by e-mail and regular mail and be afforded a ten day cure period from the Landlord under the Facility Lease before any monetary breach under the Facility Lease shall constitute a default and Buyer shall be entitled to such other notice and cure periods in the Facility Lease with respect to non-monetary defaults thereunder.  In the event Buyer does not

24

cure any monetary default within the ten day cure period, the Facility Lease shall be deemed automatically rejected without further order of the Court and Landlord shall be entitled to immediate possession of the Leased Premises, without further notice to Buyer, provided, however, this provision shall be without prejudice to the Buyer obtaining an emergency hearing as soon as the Court's calendar shall permit seeking to enforce this Sale Order as to the performance of the agreements with the Landlord, including the automatic rejection of the Facility Lease.  As to the automatic rejection provisions of the agreement, the sole issues to be resolved at any hearing will be disputes over whether notice was provided as required and whether the payments required hereunder were timely made.

U.      There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer as a result of the assumption, assignment and sale of the Assumed Agreements or the Buyer's occupation of the Facility.  The validity of the assumption, assignment and sale to the Buyer shall not be affected by any dispute between any of the Debtors and non-debtor party to an Assumed Agreement regarding the payment of any amount, including any cure amount under the Bankruptcy Code.  The Assumed Agreements, upon assignment to the Buyer, shall be deemed valid and binding, in full force and effect in accordance with their terms.

V.      The Debtors and the Buyer have further agreed that the time period within which Buyer may exercise the River Murray Option (as defined in Section 7.11(a) of the Asset Purchase Agreement) is extended such that the River Murray Option shall survive and remain enforceable after the Closing under the Asset Purchase Agreement, and shall expire sixty days after the date this Order is entered by the Court.  Notwithstanding any conflicting provisions of

25

1849985-2
439341

the Asset Purchase Agreement, the Buyer may exercise the River Murray Option and acquire 100% of the outstanding capital stock of River Murray (the "Stock")  free and clear of all liens and claims against such Stock, for no additional consideration payable upon such exercise,  by giving written notice to Seller (in the manner provided for notices under the Asset Purchase Agreement) before the expiration of such 60-day time period.  If the River Murray Option is timely exercised, then, the closing of such the transfer of the Stock shall occur within five business days after the notice of exercise of the River Murray Option is given, pursuant to the other terms of Section 7.11 of the Asset Purchase Agreement.  If Buyer fails timely to exercise the River Murray Option, then, Seller shall cause River Murray Training PTY LTD, the Australian subsidiary of the TWL Knowledge Group, Inc., a Delaware corporation ("River Murray") to execute and deliver to Buyer and in favor of Buyer's  successors and assigns (within five business days after the expiration of  the River Murray Option) an agreement (the "Restrictive Agreement"), in form and substance acceptable to Buyer in its sole discretion as contemplated by Section 7.11 of the Asset Purchase Agreement, and such other terms and provisions as may be reasonably requested by Buyer.

W.      The Court approves the transfer and assignment by the Debtors to Buyer, and its successors and assigns of all of the Debtors' rights, titles and estates, in and to each of the accreditations and approvals listed on Schedule 5.3(g) of the Asset Purchase Agreement, together with all rights, powers and privileges owned by Debtors related thereto, free and clear of all Liens, Claims and Interests for the remaining term of each such applicable accreditation(s) and/or approval(s).

1849985-2
439341

X.      The Objection filed by Skill Ventures to the Sale Motion and Skill Ventures request at the Sale Hearing for adequate protection within the meaning of Section 363(e) are overruled and denied for the reasons stated by the Court on the record at the conclusion of the Sale Hearing and as set forth herein.

Y.      Any other objections to the Sale Motion not otherwise expressly addressed herein are hereby overruled or have been withdrawn or resolved.

Z.      Pursuant to Sections 105(a), 363 an 365 of the Bankruptcy Code, all parties to the Assumed Agreements are forever barred and enjoined from raising or asserting against the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Agreements existing as of the Closing or arising by reason of the Closing.  Any party that may have had the right to consent to the assignment of its Assumed Agreement is deemed to have consented to such assignment for purposes of Section 365(e)(2)(A)(ii) of the Bankruptcy Code.  By virtue of such assumption and assignment, such party shall have no further claims against the Debtors or their estates.

AA.      After the Closing, the Buyer shall assume and perform the obligations relating to the Assumed Agreements, as set forth in the Asset Purchase Agreement.  After the Closing, the Debtors shall have no liability related to the Assumed Agreements.

BB.      Except for Valens, whose liens shall attach to the proceeds of the Purchased Assets in the same order of priority as they existed prior to the Closing and shall no longer attach to the Purchased Assets, if any person or entity, except Valens, who has filed statements or other documents or agreements evidencing Liens on, or interests in, the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the

1849985-2
439341

appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Purchased Assets, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

CC.     Any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, Skill Ventures, or any existing or former creditor, customer, vendor, supplier or employee of the Debtors (i) shall be transferred to the Buyer free and clear of the Liens, Claims and Interests and (ii) shall be delivered at the time of Closing to the Buyer unless, pursuant to the Asset Purchase Agreement, such person, entity, vendor, supplier or employee may retain temporary possession or control of any of such Assets, in which case the possession of such item shall be delivered to the Buyer at such time as is designated by the Buyer.

DD.     Pursuant to the Asset Purchase Agreement, after the Closing, and the Valens payoff, Debtors and Valens shall turn over to Buyer any future collections received on account of any of the Purchased Assets.

EE.     The cash in the DIP Operating Account ("DIP Cash") shall not be turned over to Buyer at the Closing and shall be used by Debtors only to pay post-petition obligations included in the Approved Budget as provided in the Financing Order.  Sixty (60) days following the Closing, the Debtors and Buyer shall reconcile the DIP Cash remaining and provided that all

1849985-2
439341

valid expenses incurred by the Debtors prior to Closing and included in the Approved Budget have been paid, any excess DIP Cash shall be turned over to the Buyer.

FF.     Nothing contained in any order of any type or kind entered in these Chapter 11 cases or any related proceeding subsequent to entry of this Order, nor in any Chapter 11 plan confirmed in these Chapter 11 cases, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, as modified on the record at the Sale Hearing, the Bidding Procedures Order, or the terms of this Order.  To the extent this Order modifies or is inconsistent with any provision of the Asset Purchase Agreement, the Order will govern.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order which may be entered confirming any plan of reorganization or liquidation for the Debtors or the conversion of the Debtors' cases from Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

GG.     The Debtors are authorized and directed to change the Debtors' names within thirty (30) days of Closing to the following:

From TWL Corp. to Trinity Liquidating I, Corp.

From TWL Knowledge Group, Inc. to Trinity Liquidating II, Inc.

HH.     The Secretary of State of the States of Nevada and Delaware are authorized and directed to forthwith accept such name changes and record such changes on its official records. The Clerk of the Bankruptcy Court ("Clerk") is authorized and directed to modify the style of this Chapter 11 case to:

**Trinity Liquidating I, Corp. and Trinity Liquidating II, Inc., Debtors**

1849985-2
439341

The Clerk, the Debtors, Valens and all other parties in interest are directed to file pleadings in this case using Trinity Liquidating I Corp. and Trinity Liquidating II, Inc. as the Debtors' names and to otherwise cease the use of all of the Debtors' current names in any documents, dockets, pleadings or other papers filed in this Court or otherwise (except to the extent otherwise required by any Government Authority, Government Order, Taxing Authority, Tax Code or Law or as necessary to effectuate the terms of this Order).

II.    This Court retains jurisdiction, after the closing of the Chapter 11 case, to:  (i) interpret, implement and enforce the terms and provisions of this Order (including potential sanctions for contempt against any party asserting a pre-Closing Lien, Claim or Interest in the Purchased Assets who attempts to assert such interest post-Closing) and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (ii) compel delivery of all Purchased Assets to the Buyer; (iii) resolve any disputes arising under or related to the Asset Purchase Agreement, the sale or the Transactions, or the Buyer's peaceful use and enjoyment of the Purchased Assets (including, without limitation, any dispute arising with respect to the Buyer's enforcement of any confidentiality agreements entered into by the Debtors or their representatives with any interested parties related to the sale of the Purchased Assets); (iv) adjudicate all issues concerning (alleged) pre-Closing Liens, Claims and Interest(s) in and to the Purchased Assets, including the extent, validity, enforceability, priority and nature of all such (alleged) Liens and any other (alleged) interest(s); (v) adjudicate any and all issues and/or disputes relating to the Debtors' right, title or interest in the Purchased Assets and the proceeds thereof, the Sale Motion and/or the Asset Purchase Agreement; and, (vi) adjudicate any and all

30

1849985-2
439341

remaining issues concerning the Debtors' rights and authority to assume and assign the Assumed Agreements (including, without limitation, issues regarding whether consent was required in connection with any such assignment) and the Buyer's rights and obligations with respect to such assignment and the existence of any default under any Assumed Agreement.

JJ.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Transactions.

KK.    This Order and the Asset Purchase Agreement shall be binding in all respects upon all claimants and creditors (whether known or unknown) of any of the Debtors, all non-debtor parties to the Assumed Agreements, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries, the Purchased Assets, and any subsequent trustees appointed in the Debtors' Chapter 11 cases or upon a conversion to Chapter 7 under the Bankruptcy Code and shall not be subject to rejection.

LL.    The stay of orders authorizing the (i) use, sale or lease of property as provided for in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure and (ii) assignment of an executory contract or unexpired lease as provided for in Rule 6006(d) of the Federal Rules of Bankruptcy Procedure shall not apply to this Order, and this Order shall be effective and enforceable immediately upon entry, notwithstanding the provisions of Rule 7062, 9014 and F.R.C.P. 62(a) such that the closing of the Sale is allowed to proceed immediately unless otherwise stayed.

MM.    The provisions of this Order are nonseverable and mutually dependent.

1849985-2
439341

NN.    As previously provided in the interim and final orders authorizing the DIP Loan, no creditor or party-in-interest in this proceeding shall have any claim against Valens under Section 506(c) of the Bankruptcy Code, or otherwise.

Signed on 12/15/2008

*Brenda T. Rhoades*    SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

32